UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HOULIHAN TRADING COMPANY, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Case No.  4:21-cv-01030-SRC |
| | ) | |
| CTI FOODS, LLC, | ) | |
| | ) | |
| Defendant(s). | ) | |

**Memorandum and Order**

Over the course of 20 years, Texas-based CTI Foods has done millions of dollars of business with Missouri-based Houlihan.  Over that time, CTI has paid over $40 million into Houlihan's Missouri bank account for more than 25 million pounds of poultry products.  Asking the Court to cast aside these facts, CTI moves to dismiss this case for lack of personal jurisdiction, or if not, to transfer the case to CTI's home court in Texas.  The facts demonstrate that the Court has personal jurisdiction over CTI and no legitimate basis exists to transfer the case.

I.      **Background**

For purposes of the Motion to Dismiss, the Court accepts as true the following facts Houlihan alleges in its complaint and includes in the affidavit accompanying its memorandum opposing CTI's Motion to Dismiss.  *See Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015).  Houlihan, headquartered in St. Louis County, specializes in buying and selling poultry products.  Doc. 1-2 at ¶ 7.  CTI, headquartered in Texas, makes and sells food items containing poultry, among other things.  *Id.* at ¶ 8.  For two decades, the parties maintained a business relationship, where Houlihan supplied CTI with various poultry products.  Doc. 23-1

1

at p. 1.  According to Houlihan, the parties' standard business practice involved CTI inquiring whether Houlihan could supply a quantity of a particular product at a certain price.  Doc. 1-2 at ¶ 9.  If Houlihan answered in the affirmative, CTI sent a purchase order, which Houlihan says signaled that CTI was ordering the product.  Doc. 23-1 at p. 1; Doc. 1-2 at ¶ 9.  Houlihan then confirmed it was able to fill the order, and "worked with its suppliers to deliver the product."  Doc. 23-1 at p. 2.  Once CTI received the delivery, it paid Houlihan, typically by wiring money into Houlihan's Missouri bank account.  Doc. 23-1 at p. 3.

Toward the end of 2020, the parties communicated back and forth about prices and quantities of poultry products for the next year.  Doc. 1-2 at pp. 4–5.  The parties disagree about the existence of a contract for an overall amount of poultry product in 2021.  The parties agree, however, that partway through 2021, Houlihan was unable to provide more frozen chicken-breast trim meat to CTI.  Doc. 1-2 at p. 6; Doc. 23 at pp. 3–4; Doc. 23-5 at p. 1.  CTI sent Houlihan a letter in July 2021, claiming Houlihan had breached a contract and threatening litigation if Houlihan did not provide the rest of the product or cover CTI's costs and damages.  Doc. 23-5 at pp. 1–2.  Houlihan then sought declaratory judgment in state court.

## II.    Standard

Federal Rule of Civil Procedure 12(b)(2) allows a party to move to dismiss a lawsuit for lack of personal jurisdiction.  A plaintiff bears the burden to "make a prima facie showing that personal jurisdiction exists, which is accomplished by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Deloney v. Chase*, 755 F. App'x 592, 595 (8th Cir. 2018) (quoting *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011)).  "Although the evidentiary showing required at the prima facie stage is minimal, the showing must be tested, not by the pleadings

alone, but by the affidavits and exhibits supporting or opposing the motion." *Id.* (quoting *K–V Pharm. Co.*, 648 F.3d at 591–92). At this stage, the Court views all the evidence in the light most favorable to the plaintiff and will not dismiss the case if the evidence, when viewed in this light, "is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Creative Calling*, 799 F.3d at 979.

## III. Discussion

### A.    The Court finds that specific personal jurisdiction exists over CTI in Missouri.

CTI argues that the Court does not have personal jurisdiction over CTI in Missouri because CTI lacks the minimum contacts with Missouri that due process requires. Doc. 19 at p. 1. In diversity cases such as this, personal jurisdiction only exists "to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *K–V Pharm. Co.*, 648 F.3d at 592 (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004)).

The Missouri long-arm statute permits a court to assert personal jurisdiction based on a number of acts, including: "(1) the transaction of any business within this state" and "(2) the making of any contract within this state . . . ." Mo. Rev. Stat. § 506.500.1. The Supreme Court of Missouri has held that courts must analyze the statutory and constitutional inquiries separately. *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 909 (8th Cir. 2012) (citing *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. 2010)). Because Missouri's long-arm statute extends "to the full extent permitted by the due process clause," a finding that a plaintiff has failed to establish minimum contacts under the due-process prong eliminates the need for a long-arm inquiry. *See K–V Pharm. Co.*, 648 F.3d at 592 (quoting *State ex rel. Metal Serv. Ctr. of Ga., Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. 1984)). However, "[t]he inquiries . . . are separate," and "[w]hile the long-arm statute extends jurisdiction to the limits of the Due

3

Process Clause, it does so only for acts within its enumerated categories." *Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012).  Thus, though the parties here focused on the due-process inquiry and did not address the statutory inquiry, the Court addresses both, starting with due process.

### 1.    CTI's contacts with Missouri satisfy due process.

Due process requires a plaintiff to establish that "sufficient 'minimum contacts' exist so that 'traditional notions of fair play and substantial justice' are not offended." *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020) (quoting *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945)).  These minimum contacts with the forum state must allow the defendant to "reasonably anticipate being haled into court there." *Id.* (citation omitted).  Under the Due Process Clause, a court may exercise general or specific personal jurisdiction over a defendant. *See, e.g.*, *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014).  Because Houlihan argues that the Court has specific jurisdiction over CTI, Doc. 23 at p. 5 n.1, the Court only addresses specific jurisdiction.

A court's jurisdiction over specific claims arises out of a relationship between the defendant, the forum, and the litigation.  *Daimler AG v. Bauman*, 571 U.S. 117, 133 (2014). Specific jurisdiction requires the suit to "arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1780 (2017) (internal quotations omitted); *see also Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) (rejecting "an exclusively causal test of connection" between a plaintiff's claims and a defendant's actions in the forum state); *Whaley*, 946 F.3d at 451 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)) (noting that "the relationship must arise out of contacts that the 'defendant himself' created with the forum state").

4

The Eighth Circuit has identified five factors to consider when determining whether a defendant has sufficient minimum contacts: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relationship of the cause of action to the contacts; (4) the interest of [the forum state] in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *K–V Pharm. Co.*, 648 F.3d at 592 (quoting *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010)) (alteration in original).  The factors are interrelated, and the Eighth Circuit considers them together.  *See id.* ("Although the first three factors are primary factors, and the remaining two are secondary factors, we look at all of the factors and the totality of the circumstances in deciding whether personal jurisdiction exists.").

Before applying these five factors, the Court notes that the existence of a contract with a citizen of a state does not by itself establish minimum contacts with that state.  *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)).  Additionally, personal jurisdiction does not rely on "mechanical tests or on conceptualistic theories of the place of contracting or of performance."  *K–V Pharm. Co.*, 648 F.3d at 593 (quoting *Burger King*, 471 U.S. at 478).  As the Eighth Circuit pointed out in *K–V Pharm. Co.*, the Supreme Court has emphasized instead

> the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Id.* (quoting *Burger King*, 471 U.S. at 479).

With these principles in view, the Court turns to the facts of this case. Here, Houlihan and CTI maintained a business relationship over two decades, with Houlihan filling thousands of orders from CTI for poultry products.  Doc. 23-1 at pp. 1–2.  During this period CTI made thousands of telephone calls to Houlihan in Missouri, sent Houlihan thousands of emails, and

5

paid Houlihan approximately $40 million dollars—typically by wiring money to Houlihan's Missouri bank—in exchange for more than 25 million pounds of poultry products.  *Id.* at p. 2. Houlihan describes the typical practice between the parties:

> CTI would solicit business from Houlihan in Missouri by telephone and/or email. In these solicitations, CTI would inquire whether Houlihan could supply a certain quantity of a desired poultry product at a desired price. If Houlihan was able to get the desired product and the parties agreed on price, CTI would send Houlihan an email with a purchase order number, signaling that it was ordering the product. Houlihan would then confirm that it could deliver the desired quantity at the agreed price and worked with its suppliers to deliver the product. After the product was delivered, CTI would pay Houlihan for the product in Missouri, usually by wiring funds into Houlihan's bank located in Missouri.

*Id.*

In November 2020, CTI emailed a Request for Proposal (RFP) to Houlihan.  Doc. 23-2 at pp. 1–4 (copy of the email containing the RFP); *see also* Doc. 23-1 at p. 2; Doc. 24-1 at p. 2. CTI also sent the same RFP to nine other poultry suppliers.  Doc. 24-1 at p. 1.  CTI followed up several times via phone and email, asking Houlihan to provide price quotes as soon as possible. Doc. 23-1 at p. 2.  Houlihan then sent CTI an email containing what Houlihan characterizes as its "price quotes," or what CTI characterizes as Houlihan's "bid."  Doc. 23-4 at p. 1 (email from Houlihan); *see also* Doc. 24-1 at p. 2 (CTI employee declaration) ("Houlihan submitted its bid to me by email."); Doc. 23-1 at p. 2 (Houlihan employee declaration) ("Houlihan's [employee] supplied the requested price quotes.").  According to Houlihan, around this time the two companies exchanged "dozens of communications" about product pricing for delivery in 2021. Doc. 23-1 at p. 2.

CTI alleges the parties entered a contract in December 2020, agreeing that in 2021 "Houlihan would provide three million pounds of frozen chicken trim to CTI, and CTI would pay to Houlihan the agreed-upon price/pound."  Doc. 19 at p. 6.  Houlihan maintains instead that in 2021 "CTI continued to purchase product from Houlihan—namely frozen chicken trim

6

meat—on an order-by-order basis, as it had for over two decades."  Doc 23-1 at p. 2.  At this

stage the Court does not address the merits of the contractual dispute.  But the Court does find

relevant for the purpose of minimum contacts analysis that, according to Houlihan, CTI

ultimately purchased more than 600,000 pounds of chicken trim from Houlihan in 2021 at a cost

of more than $400,000.  Doc 23-1 at p. 3.  CTI similarly states that "Houlihan delivered a portion

of the promised chicken trim" in 2021.  Doc. 1 at p. 1; *see also* Doc. 24-1 at p. 2 (CTI employee

declaration) (referring to Houlihan filling CTI orders in 2021); Doc. 23-5 (CTI letter to

Houlihan) (referring to Houlihan delivering "approximately 120,000 pounds" of chicken trim).

In July 2021, after Houlihan was unable to procure more product, CTI sent a letter

claiming Houlihan had "stopped performing its contractual obligations."  Doc. 23-5 at p. 1.  CTI

demanded that Houlihan either deliver the remaining chicken trim, pay $1.6 million to cover

CTI's costs and damages, or propose an acceptable alternative solution.  *Id.* at p. 2.  CTI put

Houlihan on notice to preserve relevant communications and documents and warned that CTI

would initiate litigation if Houlihan did not respond within five days.  *Id.*  Houlihan then sought

a declaratory judgment in state court, and CTI removed the case to this Court.  Doc. 1.

Regardless of whether the purchases in 2021 were each one-time orders or part of a larger

obligation, the events described above implicate the contract-related factors in *Burger King*: the

parties' prior negotiations, the terms of the contract, anticipated future consequences, and the

parties' actual course of dealing.  *See Burger King*, 471 U.S. at 479.  Under Article 1 of the

Missouri Uniform Commercial Code, "[a] 'course of dealing' is a sequence of conduct

concerning previous transactions between the parties to a particular transaction that is fairly to be

regarded as establishing a common basis of understanding for interpreting their expressions and

other conduct."  Mo. Rev. Stat. § 400.1-303(b).  Additionally, "the express terms of an

agreement and any applicable course of performance, course of dealing, or usage of trade shall be construed whenever reasonable as consistent with each other." Mo. Rev. Stat. § 400.1-303(e). Article 1 applies to, among other things, the sale of "goods"—including chicken trim, since "'goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." Mo. Rev. Stat § 400.2-105; *see also* Doc. 24 at p. 1 (CTI Reply Mem.) ("This action concerns whether the parties formed a contract for the purchase and sale of chicken trim in November 2020."); Doc. 23 at p. 2 (Houlihan Opp'n Mem.) ("This is an action . . . seeking a declaration that, among other things, the parties did not enter into an agreement requiring Houlihan to provide a definite quantity of trim meat.").

Thus, while CTI argues that the parties' historical business relationship and past orders are "completely disconnected" from the issue of whether the parties formed a contract in November 2020, Doc. 24 at pp. 2–3, the Court disagrees. Under *Burger King*, the course of dealing between CTI and Houlihan is relevant as part of a "highly realistic" approach to determining whether a defendant has sufficient minimum contacts to support personal jurisdiction. 471 U.S. at 479. And the UCC makes the parties' course of dealing relevant to the dispute over the purchase and sale of chicken trim.

Viewed through this lens, factors one and two of the Eighth Circuit's minimum-contacts test—the nature and quality of the contacts, and the quantity of the contacts—weigh in favor of Missouri jurisdiction over CTI. Though CTI did not send employees to Missouri, it did solicit Houlihan's business when it sent an RFP in November 2020 to Houlihan—a Missouri company that CTI had a longstanding business relationship with. Though Houlihan served as a broker and not a direct supplier, CTI nevertheless contracted with Houlihan to provide poultry products that CTI needed. The parties' business relationship across two decades involved CTI's placing

8

thousands of orders, making thousands of phone calls, and sending as many emails—all to Houlihan in Missouri.  During this time CTI paid approximately $40 million into Houlihan's Missouri bank account in exchange for Houlihan's providing more than 25 million pounds of poultry products.

The third factor—the relationship of the cause of action to the contacts—also weighs in favor of jurisdiction.  Here the dispute arises from a disagreement over the nature of the contractual relationship between the two parties in 2021.  Did the parties enter a contract for the whole three-million-plus pounds of chicken trim in 2021, or did CTI place separate orders each time it requested a delivery?  Either way, as Houlihan correctly identifies, CTI's contacts with Missouri lie "at the heart of this contract dispute," Doc. 23 at p. 12, and thus directly relate to Houlihan's claims.  *See generally Ford Motor Co.*, 141 S. Ct 1017 (holding a state can exercise specific jurisdiction over a defendant if the defendant's contacts "relate to" the plaintiff's claim); *see also Kaliannan v. Liang*, 2 F.4th 727, 734 (8th Cir. 2021) (citing *Ford Motor Co.*, 141 S. Ct. at 1025) (holding that "the third factor weighs in favor of finding jurisdiction because Defendant's contacts with [the forum state] 'directly relate to' Plaintiffs' claims").

The fourth factor favors personal jurisdiction over CTI, because Missouri has an interest in providing a forum for Houlihan, a Missouri citizen, to obtain redress.  The fifth factor is neutral, because transferring the case to Texas would just shift any inconvenience to the other party.  Thus, the first three "primary" factors weigh in favor of jurisdiction. And the secondary factors also favor jurisdiction.

The Court acknowledges that CTI has no agent for service of process in Missouri, no Missouri employees or telephone listings, and no Missouri property or bank accounts.  Doc. 19 at p. 6.  CTI is not registered to do business in Missouri and does not advertise or promote its

business in Missouri.  *Id.*  CTI solicited Houlihan's business via telephone and email, but at least as it relates to this specific case, did not send any employees to Missouri.  Doc. 23-1 at p. 1; Doc. 19-1 at p. 1 ("No employee of CTI has travelled to Missouri in connection with the agreement to purchase chicken trim described in [Houlihan]'s petition.").

Based on these facts, CTI relies on *Dairy Farmers*, 702 F.3d 472.  In that case, Dairy Farmers of America, a Kansas association headquartered in Missouri, sued Bassett & Walker International, a Canadian corporation, claiming that Bassett breached the parties' contract.  *Id.* at 474.  The district court dismissed the case for lack of personal jurisdiction, and the Eighth Circuit affirmed.  *Id.*  The Eighth Circuit noted that the defendant, Bassett, had "no agent for service of process, offices, property, bank accounts, telephone listings, or employees" in Missouri, did not advertise or promote its business in Missouri, and did not send its employees into Missouri.  *Id.* at 474.

But significant differences exist between *Dairy Farmers* and this case.  First, Dairy Farmers' representative negotiated transactions with Bassett "while traveling" as well as "from his home office in Michigan."  *Id.*  The court found that Dairy Farmers and Bassett conducted negotiations between Michigan and Canada, and that no "prior negotiations" occurred in Missouri.  *Id.* at 478.  The court characterized the administrative activities at Dairy Farmers' Missouri headquarters as merely "random, fortuitous, or attenuated," at least in part because "[t]he contract did not contemplate that Dairy Farmers would perform coordination and processing in Missouri."  *Id.* at 478–79 (citing *Burger King*, 471 U.S. at 486).  Here, on the other hand, over two decades CTI made thousands of phone calls and sent thousands of emails to Houlihan *in Missouri*—including "dozens of communications" about pricing leading up to the current dispute in 2021.  Doc. 23-1 at p. 2.  CTI sent a demand letter to Houlihan in Missouri,

threatening litigation if Houlihan did not respond.  *Id.* at p. 3.  Neither party claims that Houlihan conducted any of its side of the business relationship outside Missouri.

Second, in *Dairy Farmers* the court identified that the contract involved products manufactured outside of Missouri and required payment from Bassett to Dairy Farmers in Illinois, not Missouri.  *Dairy Farmers*, 702 F.3d at 478.  Here, CTI alleges Houlihan similarly arranged for poultry suppliers outside Missouri to fill CTI's orders, at least in 2021. *See* Doc. 24-1 at p. 2.  But unlike in *Dairy Farmers*, here during the parties' two-decade relationship CTI paid some $40 million dollars to Houlihan *in Missouri*.  Doc. 23-1 at pp. 1–2.

CTI also claims this case resembles *C. Pepper Logistics, LLC v. Lanter Delivery Systems, LLC, et al.*, No. 20-cv-01444, 2021 WL 3725680 (E.D. Mo. Aug. 23, 2021), where another judge of this Court granted a motion to dismiss for lack of personal jurisdiction over out-of-state defendants.  But in that case, the only contact the five individual defendants had with Missouri was a single email—a far cry from the thousands of emails and phone calls here.  *Id.* at *5.  In that case the corporate defendant seeking dismissal for lack of personal jurisdiction—a Florida company headquartered in Florida—allegedly engaged in tortious conduct in "several places across the United States,"  but the Court held that "there is nothing particular about its conduct that ties that conduct to Missouri."  *Id.* at *6; *see also id.* at *6 n.1 (noting that "the Amended Complaint gives the impression that none of [defendant company]'s allegedly tortious conduct occurred in Missouri").  Here, the connection between CTI and Missouri stems from CTI's engaging in a two-decade business relationship with Houlihan, including making thousands of communications and depositing millions of dollars into Houlihan's Missouri bank accounts.

On the other hand, Houlihan argues that "courts routinely find sufficient minimum contacts even when a defendant had no or limited physical contact with a state, where, as here, a

party actively solicits business from a party in the forum state, engages in negotiations with that party, and then forms and maintains a contractual relationship with that party." Doc. 23 at p. 7. In support, Houlihan cites to *Wells Dairy* and *Creative Calling*.

In the first case, Wells Dairy, an Iowa corporation, sued Food Movers, a California corporation, in Iowa state court for breach of contract. *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 517 (8th Cir. 2010). Food Movers removed the case and moved to dismiss for lack of personal jurisdiction. *Id.* The district court denied the motion, and the Eighth Circuit affirmed. *Id.* To support its finding that Food Movers' contacts with Iowa subjected it to personal jurisdiction there, the Eighth Circuit identified "[c]ertain meaningful events in the parties' business relationship" that occurred in the forum state:

- Food Movers submitted a credit application to Wells Dairy's office in Iowa;
- Wells Dairy processed and approved the credit application in Iowa, enabling Food Movers to charge approximately $6.5 million to its Wells Dairy account;
- Food Movers effectively accepted delivery of Wells Dairy product in Iowa and redelivered the product to Food Movers' customers;
- Food Movers sent payment to Wells Dairy in Iowa for each purchase;
- Food Movers conducted more than 100 of these transactions over two years; and
- Food Movers relied on Wells Dairy for customer support during this time.

*Id.* at 519. The Eighth Circuit also noted that though Food Movers "was not physically present in Iowa, its initial contacts with Wells Dairy took place in California, and its communications with the Wells Dairy Iowa office occurred only via telephone, facsimile, and mail," these facts were not dispositive. *Id.* The Eighth Circuit concluded that, "taken together, [Food Movers'] contacts with Iowa amounted to the minimum contacts required by due process." *Id.* at 520. *But see Fastpath*, 760 F.3d at 824 (distinguishing *Wells Dairy* and finding no personal jurisdiction in Iowa based on a confidentiality agreement because the out-of-state defendant's "solicitation of the Agreement took place outside Iowa, the Agreement does not specifically contemplate the exchange of information in Iowa, no information exchange took place in Iowa, the covenant not

to compete is not limited to or focused on Iowa, and any alleged breach of the Agreement occurred outside Iowa").

In the second case, Creative Calling, an Iowa corporation, sued LF Beauty, a Hong Kong company, for breach of contract. *Creative Calling*, 799 F.3d at 978. The district court granted LF Beauty's motion to dismiss for lack of personal jurisdiction, and the Eighth Circuit reversed, finding that "a reasonable jury could find that LF Beauty had sufficient contacts with Iowa to justify the exercise of personal jurisdiction . . . ." *Id.* The Eighth Circuit identified four facts supporting personal jurisdiction:

- LF Beauty solicited Creative Calling's business by contacting it in Iowa;
- LF Beauty "engaged in daily communications with Creative Calling for almost two years after contractual negotiations had concluded";
- LF Beauty "shipped thousands of pre-production and production samples to Iowa pursuant to the contract"; and
- LF Beauty "remitted payments to Creative Calling in Iowa under the agreement."

*Id.* at 980–81. The Eighth Circuit stated that "[a] defendant's solicitation of a business relationship with a company incorporated in the forum State that takes place within that State is a relevant contact in determining whether its courts may exercise personal jurisdiction," *id.* (citing *Fastpath*, 760 F.3d at 822–24), and noted that although email and phone communications "do not themselves establish jurisdiction, they may be used to support the exercise of personal jurisdiction." *Id.* at 980. Further, a "contractual provision[] requiring a defendant to remit payment to a company located in the forum State, and the defendant's performance of that term, is a purposeful contact with the forum." *Id.* at 981 (citing *K–V Pharm. Co.*, 648 F.3d at 593–94).

In *K–V Pharmaceutical,* a Missouri business, K–V, sued J. Uriach, a Spanish corporation, in federal court in Missouri, alleging breach of contract and misappropriation of trade secrets. *K–V Pharm. Co.*, 648 F.3d at 590–91. The district court dismissed for lack of personal jurisdiction, and K–V appealed. *Id.* at 591. The Eighth Circuit reversed, finding that "[t]he

13

totality of the circumstances convinces us that the minimum contacts necessary to confer personal jurisdiction over Uriach exist in the present case." *Id.* at 594. The Eighth Circuit identified several key contacts supporting its finding:

- Uriach officials came to Missouri in 2001 to renegotiate a contract with K–V;
- Uriach paid money to K–V according to the parties' contract;
- Uriach "exchang[ed] many letters, emails, and telephone calls with [K–V] throughout the 12 years that the contract was in existence"; and
- Uriach "expected to have even more extensive contacts with Missouri, as the terms of the contract demonstrate."

*Id.* at 594–95. The court further noted that the causes of action—K–V's "breach-of-contract and misappropriation-of-trade-secrets claims"—related to Uriach's contacts with Missouri, because "[i]f these companies had not been involved in a long-term contractual relationship with each other, Uriach would not have had access to [K–V]'s alleged trade secrets." *Id.* at 595.

When considering these precedents, the Court heeds the fact that the Eighth Circuit has "note[d], as has the Supreme Court, that the determination of whether minimum contacts exist 'is one in which few answers will be written in black and white. The greys are dominant and even among them the shades are innumerable.'" *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 820 (8th Cir. 1994) (internal quotation marks omitted) (quoting *Kulko v. California Super. Ct.*, 436 U.S. 84, 92 (1978)). With that in mind, the Court finds that while the facts in this case do not mirror every fact supporting personal jurisdiction in *Wells Dairy*, *Creative Calling*, and *K–V Pharmaceutical*, the significant similarities support personal jurisdiction over CTI.

First, like the out-of-state defendants in *Wells Dairy* and *Creative Calling*, CTI solicited Houlihan's business by emailing an RFP to Houlihan in Missouri. Doc. 23-2. CTI argues that sending the RFP to Houlihan "did not solicit Houlihan's business" and "does not suggest that CTI intended to perform a contract in Missouri" because the RFP did not directly target Houlihan but was sent to "10 different companies located in various states . . . ." Doc. 24 at pp.

14

4–5.  CTI also argues that Houlihan solicited CTI's business, not the other way around.  *Id.*  The Court finds these arguments unpersuasive.  CTI points to no authority holding that sending a "request for proposals" to multiple companies is not "soliciting" the business of any of them individually.  And in this case, CTI had already done business with Houlihan for two decades—so the argument that the RFP does not indicate CTI intended to perform a contract in Missouri lacks merit.  Additionally, the RFP *did* lead to the parties doing business in 2021 (whether under a larger contract for the whole year, as CTI claims, or through individual orders, as Houlihan claims).

Second, like the out-of-state defendants in *Wells Dairy*, *Creative Calling*, and *K–V Pharmaceutical*, CTI paid money to Houlihan in Missouri—a relevant personal-jurisdiction contact that makes this case more like those three cases than *Dairy Farmers*.  The $40 million CTI paid to Houlihan in Missouri during the parties' business relationship exceeds the amounts the Eighth Circuit characterized as "significant" in *Wells Dairy* ($6.5 million), 607 F.3d at 519, and *K–V Pharmaceutical* (at least $100,000, plus additional periodic payments "ranging from $50,000 to $150,000"), 648 F.3d at 593–94.  In *Creative Calling*, the Eighth Circuit noted that the defendant made "significant payments" to the forum-state-plaintiff, 799 F.3d at 978–79, and here the Court finds $40 million more than significant.

Third, like the out-of-state defendants in *Creative Calling* and *K–V Pharmaceutical*, CTI communicated extensively with Houlihan in Missouri via email and over the phone during the parties' two-decade business relationship.  As the Eighth Circuit has noted, though these communications "'do not themselves establish jurisdiction,' they 'may be used to support the exercise of personal jurisdiction.'"  *Id.* at 980 (quoting *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996)).

15

Finally, the differences between this case and *Wells Dairy*, *Creative Calling*, and *K–V Pharmaceutical* largely concern the out-of-state defendant's *physical* contact—or lack thereof—with the forum state.  When considering these differences, the Court heeds the Supreme Court's guidance in *Burger King* that:

> [a]lthough territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.

471 U.S. at 476.

In the 35 years since Burger King, modern commercial life depends far more on remote communications via technologies that either were in their infancy or did not exist in 1985.  This case illustrates the point.  Here, the record does not indicate that CTI has a physical presence in Missouri, or that CTI employees physically visited Missouri in connection with CTI's business with Houlihan.  Doc. 24 at p. 5.  And CTI (the purchaser here) did not ship samples to the forum state like the out-of-state defendant did in *Creative Calling*, or pick up the plaintiff's product in the forum state like the out-of-state defendant did in *Wells Dairy*.  Yet CTI had extensive non-physical contacts with Missouri over decades, including solicitations, emails, and payments of substantial amounts of money, all without ever entering the state.  Given the nature and extent of these contacts, CTI reasonably should expect to be "haled into court" in Missouri.  *See K-V Pharm. Co.*, 648 F.3d at 592 (quoting *Burger King*, 471 U.S. at 474).  Considering the totality of the circumstances, the Court finds that CTI's contacts with Missouri more than satisfy the minimum contacts due process requires, and CTI's lack of physical presence "cannot defeat personal jurisdiction."  *Burger King*, 471 U.S. at 476.

16

### 2.   Houlihan has met its burden of establishing that CTI's contacts with Missouri satisfy the Missouri long-arm statute's requirements.

Here, the Court begins by noting that CTI waived any argument regarding the long-arm statute by choosing not to address it in either of its motion-to-dismiss memoranda.  CTI argued instead that "[t]he Court need not analyze whether CTI's conduct falls within the scope of Missouri's long-arm statute because it is clear that CTI does not have sufficient minimum contacts with Missouri for the Court's exercise of specific personal jurisdiction to comport with due process."  Doc. 19 at p. 8.

Even so, the Court finds that CTI satisfies the first category in the Missouri long-arm statute—"the transaction of any business within the state."  The Missouri Supreme Court has held that courts must construe "transaction of any business" broadly.  *State ex rel. Metal Serv. Ctr. of Georgia, Inc.*, 677 S.W.2d at 327.  Further, an out-of-state corporation like CTI "may be subject to longarm jurisdiction even though it would not be required to qualify to do business as a foreign corporation," and "the business may consist of a single transaction, if that is the transaction sued upon." *Id.*  The Court finds that CTI transacted business in Missouri when it entered into a contract or series of contracts with Houlihan for poultry products and paid for those products in Missouri.  Leaving aside the merits of the dispute, the Court finds that this suit arises from the transaction or series of transactions between the parties in Missouri, satisfying the first prong of the Missouri long-arm statute.

Additionally, taken as true, Houlihan's allegations establish facts adequate to satisfy the second prong of the Missouri long-arm statute—"the making of any contract within this state." In Missouri, "[f]or purposes of the long-arm statute, a contract is made where acceptance occurs." *Strobehn v. Mason*, 397 S.W.3d 487, 498 (Mo. Ct. App. 2013) (citing *Wilson Tool &*

*Die, Inc. v. TBDN–Tenn. Co.*, 237 S.W.3d 611, 615 (Mo. Ct. App. 2007)).  Houlihan alleges that

during the parties' business relationship:

> the standard practice between the parties is that CTI inquires whether Houlihan can
> supply a quantity of a desired poultry product at a certain price. If Houlihan can get
> the desired product and the parties agree on the price, CTI sends Houlihan a
> purchase order number, signaling that it is ordering the product. Houlihan then
> confirms that it can deliver the desired quantity of product at the agreed price, and
> works with its suppliers to deliver the product. After the product is delivered, CTI
> pays Houlihan for the product.

Doc. 1-2 at ¶ 9.  Viewing the allegations most favorably to the existence of the jurisdictional fact,

*Bryant*, 310 S.W.3d at 231, the Court finds that the final act binding the parties occurred when

Houlihan confirmed that it could deliver a specific quantity of product at a specific price.  *See,*

*e.g.*, *Tiger Mfg. Corp. v. Loadstar Material Handling Equip., Ltd.*, 341 F. Supp. 2d 1107, 1109

(W.D. Mo. 2004) (finding that the defendant "made a contract within [Missouri]" because the

plaintiff "accepted [defendant]'s purchase orders at its Missouri office."); *U.S. Durum Milling,*

*Inc. v. Frescala Foods, Inc.*, 785 F. Supp. 1369, 1372 (E.D. Mo. 1992) (concluding "that the

final act binding the parties occurred when [plaintiff] accepted . . . defendant's bid for a set

quantity at a fixed price for delivery during a definite time period.").  Thus, for purposes of the

motion to dismiss, the Court finds that Houlihan has met its burden to show that CTI entered into

contracts in Missouri, satisfying the Missouri long-arm statute.

Because CTI's contacts with Missouri satisfy the statutory and constitutional

requirements for personal jurisdiction, the Court denies CTI's Motion to Dismiss.

**B.      The factors in 28 U.S.C. § 1404 weigh against transferring venue.**

If the Court does not dismiss this case for lack of personal jurisdiction, CTI asks the

Court to transfer the case under 28 U.S.C. § 1404(a) to the U.S. District Court for the Northern

District of Texas.  Doc. 19 at p. 13.  As the party seeking transfer of venue under § 1404(a), CTI

bears the burden of showing that the transfer is warranted.  *See Terra Int'l, Inc. v. Mississippi*

*Chem. Corp.*, 119 F.3d 688, 695 (8th Cir. 1997) (noting that "[i]n general, federal courts give considerable deference to a plaintiff's choice of forum"). When considering whether to transfer under § 1404(a), the Court must consider the statute's three factors: (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. *Terra Int'l*, 119 F.3d at 695. The statute also limits transfer to those districts where the case "might have been brought." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

CTI acknowledges that the first two factors—the convenience of the parties and convenience of the witnesses—are neutral here. Doc. 19 at p. 14. CTI argues that the third factor, the interests of justice, weighs in favor of transfer because "CTI tried diligently to resolve this matter with Houlihan before it would have to file a breach of contract lawsuit in Texas," and that Houlihan improperly filed suit in Missouri "[r]ather than engage in negotiations to resolve the dispute." *Id.* Houlihan argues in response that CTI's letter threatened litigation unless Houlihan paid CTI $1.6 million, and Houlihan decided "to invoke the judicial process" instead of waiting for CTI to sue. Doc. 23 at pp. 14–15. CTI cites no authority for what amounts to an argument that courts should deny the party that sues first its chosen venue simply because that party didn't wait for the other party to sue. The Court declines to adopt such a rule, and finds that the interests-of-justice factor does not weigh in CTI's favor. Because the Court finds that the three factors are neutral, CTI has not met its burden and the Court declines to transfer venue.

## IV.  Conclusion

For these reasons, the Court denies CTI's [18] motion.

So Ordered this 3rd day of December 2021.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**