UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| HOULIHAN TRADING COMPANY, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-01030-SRC |
| | ) | |
| CTI FOODS, LLC, | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |
| | ) | |

**Memorandum and Order**

Though Houlihan and CTI Foods long enjoyed a warm relationship, their association has turned icy.  Despite supplying CTI with frozen chicken-breast trim for the entire first quarter of 2021, Houlihan says it never contracted with CTI.  Winning a race-to-the-courthouse, Houlihan sued CTI in Missouri for a declaratory judgment, to which CTI responded with a two-count counterclaim alleging breach of contract and promissory estoppel.  Houlihan now moves to dismiss CTI's counterclaim, arguing primarily that the facts as alleged by CTI fail to establish the existence of a contract.

**I.     Background**

For purposes of the motion to dismiss, the Court accepts as true the following facts CTI alleges in its counterclaim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also McDonnell Douglas Corp. v. SCI Tech., Inc.*, 933 F. Supp. 822, 824 (E.D. Mo. 1996) ("[T]his Court must take the allegations of the counterclaim as true.").

CTI, a food-product manufacturer, routinely purchases a substantial quantity of poultry from various suppliers, while Houlihan, a wholesale poultry distributor, functions as a middleman and procures poultry products for manufacturers like CTI.  Doc. 27 at ¶¶ 6–7.  In November 2020, CTI issued a request for proposal (RFP) to various poultry suppliers, including Houlihan, for about 3.2 million pounds of frozen chicken-breast trim—all the trim meat CTI needed for 2021.  *Id.* at ¶¶ 8–9.  In the cover e-mail sending the RFP to Houlihan, Jason Lansdell, CTI's protein procurement manager, wrote that "this RFQ pricing will be through the time period of January 1, 2021 through December 31 2021."  *Id.* at ¶ 11.  Under the terms of the RFP, a prospective supplier's quote would "constitute an offer, which remains valid for a minimum period of 120 days after the quotation submission date," and "each bid submitted by a supplier shall constitute an offer to supply in accordance with this RFP . . . All bids submitted through the RFP shall remain valid, firm and subject to unconditional acceptance until award notifications are issued."  *Id.* at ¶¶ 12–13; *see also* Doc. 30-1 at p. 3.

The RFP also contained the following language:  "Nothing contained in this RFP creates, nor shall be construed to create, any contractual relationship between CTI Foods and any supplier. . . . [A]ny binding contractual relationship may be made only in and through a written agreement signed by both parties."  Doc. 30-1 at p. 2.  The RFP also says: "Due to the uncertainty in business demand, this estimate of needs does not constitute a commitment by CTI Foods to purchase a given quantity of any item.  CTI Foods will make that commitment based upon need."  *Id.*  As a contract document attached to Houlihan's motion to dismiss, Doc. 30 at p. 2; Doc. 30-1, the authenticity and accuracy of which CTI does not contest, the Court considers the RFP at the motion-to-dismiss stage.  *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th

Cir. 2003) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss.").

In an e-mail to CTI, Travis Griffin, a Houlihan trader, said that Houlihan could provide approximately one truckload per week of frozen chicken-breast trim at 69 cents per pound, plus spot help as needed. Doc. 27 at ¶¶ 14–15. Griffin then submitted a bid to supply CTI with frozen chicken-breast trim in 2021 by submitting a completed RFP. *Id.* at ¶ 16. Houlihan's completed RFP stated that Houlihan could provide the requested estimated quantity of approximately 3.2 million pounds of frozen chicken-breast trim at 69 cents per pound. *Id.*

Lansdell then called Griffin, asking Houlihan to drop its price to 67 cents per pound. *Id.* at ¶ 17. In December 2020, which CTI mistakenly referenced as December 2021 in its counterclaim, Griffin confirmed that Houlihan could supply frozen chicken-breast trim at a "set price" of 67 cents per pound in 2021. *Id.* at ¶ 18; *see* Doc. 38 at p. 2 n.1. Griffin also submitted a revised RFP listing the 67-cents-per-pound price. Doc. 27 at ¶ 19. CTI alleges that these communications, including Houlihan's revised RFP, constituted an offer. *Id.* at ¶ 20. CTI says it accepted Houlihan's offer in a telephone call between Griffin and Lansdell on December 16, 2021. *Id.* at ¶ 22.

Houlihan began performing its obligations under the contract in the new year. *Id.* at ¶ 23. In January 2021, Houlihan arranged for delivery of five truckloads, approximately 181,080 pounds, of frozen chicken-breast trim to CTI at the agreed price of 67 cents per pound. *Id.* at ¶ 24. In February 2021, Houlihan arranged for delivery of five truckloads, approximately 200,000 pounds, of frozen chicken-breast trim at the agreed price of 67 cents per pound. *Id.* at ¶ 25. In March 2021, Houlihan delivered three truckloads, approximately 120,000 pounds, of frozen chicken-breast trim to CTI at the agreed price of 67 cents per pound. *Id.* at ¶ 26. Then, towards

the end of March 2021, CTI informed Houlihan that it needed four truckloads of frozen chicken-breast trim in April 2021.  *Id.* at ¶ 27.  Griffin confirmed that Houlihan would secure the requested product and follow up with CTI.  *Id.* at ¶ 28.

On March 26, 2021, Griffin told Lansdell that Houlihan could not supply the requested frozen chicken-breast trim, but said that Houlihan would consider supplying fresh, chicken-breast trim as a substitute.  *Id.* at ¶ 29.  On April 5, 2021, Lansdell followed up with Griffin and asked "What about bringing in fresh?  Are you not going to honor the contract with fresh?"  *Id.* at ¶ 30.  Griffin responded that Houlihan had been "honoring our deal and bringing in frozen with a loss all year.  We do not have a deal on fresh product."  *Id.* at ¶ 31.  From then on, Houlihan no longer provided CTI with frozen chicken-breast trim or a suitable alternative and refused to provide any compensation.  *Id.* at ¶ 32.

As a result, CTI purchased cover product at market price.  *Id.* at ¶ 33.  CTI obtained enough frozen chicken-breast trim to meet its 2021 needs, but at a cost of between $1.10 to $1.30 per pound.  *Id.* at ¶ 33.  In its prayer for relief, CTI requests the Court award actual damages, interest, fees and costs, as well as "any other relief to which CTI may be justly entitled at law or at equity."  *Id.* at p. 10.

Over the summer of 2021, Houlihan sued CTI in Missouri state court, seeking a declaration that the two companies had not entered into a contract for the sale of chicken trim.  Doc. 7.  CTI removed the case to this Court, Doc. 1, and Houlihan promptly moved for summary judgment., Doc. 9.  CTI then moved to dismiss Houlihan's complaint, arguing the Court lacked personal jurisdiction over it.  Doc. 18.  The Court denied CTI's motion to dismiss, Doc. 25, so CTI filed its answer, along with a two-count counterclaim against Houlihan for breach of contract and promissory estoppel, Doc. 27.  After that, the Court denied without prejudice

Houlihan's then-pending motion for summary judgment to provide CTI an opportunity to conduct discovery. Doc. 40; *see* Fed. R. Civ. P. 56(d). Houlihan now moves to dismiss CTI's counterclaim for failure to state a claim upon which relief can be granted. Doc. 29; Fed. R. Civ. P. 12(b).

## II.     Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." The notice pleading standard of Rule 8(a)(2) of the Federal Rules of Civil Procedure requires the plaintiff to give "a short and plain statement showing that the pleader is entitled to relief . . . ." To meet this standard and to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010). Ordinarily, only the facts alleged in the complaint are considered for purposes of a motion to dismiss; however, materials attached to the complaint may also be considered in construing its sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff . . . ." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). However, if a claim fails to allege one of the elements necessary to recover on a legal

theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted.  *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011).  Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation.  *Twombly*, 550 U.S. at 555 (citation omitted); *Iqbal*, 556 U.S. at 677–78.

### III.    Discussion

Houlihan moves to dismiss both counts of CTI's counterclaim under Federal Rule of Civil Procedure 12(b)(6).  Docs. 24, 32.  Against CTI's breach-of-contract claim, Houlihan incorporates by reference its arguments made in support of its previously filed motion for summary judgment.  Doc. 10; Doc. 30 at pp. 4–5.  Houlihan argues that CTI fails to allege both the existence, and an essential term of, a contract, and also says the statute of frauds bars the claim.  Houlihan further contends the promissory-estoppel claim fails for similar reasons.  The Court addresses each claim in turn.

The parties agree that either Missouri or Texas law governs this case, and neither party asked the Court to decide the question now, so the Court reserves ruling on the issue.  *See, e.g.*, *Phillips v. Marist Soc. of Washington Province*, 80 F.3d 274, 276 (8th Cir. 1996).  Further, throughout their memoranda, the parties repeatedly assume the Uniform Commercial Code (UCC), adopted by both Missouri and Texas, applies; for purposes of the motion, the Court makes the same assumption.

### A.    Breach of contract

Under either Missouri or Texas law, CTI must plead three essential elements to state a claim for breach of contract:  "(1) the existence and terms of a contract; (2) that plaintiff

6

Case: 4:21-cv-01030-SRC   Doc. #:  44   Filed: 04/01/22   Page: 7 of 16 PageID #: 399

performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (citing *Howe v. ALD Servs., Inc.*, 941 S.W.2d 645, 650 (Mo. Ct. App. 1997)); *Marquis Acquisitions, Inc. v. Steadfast Ins. Co.*, 409 S.W.3d 808, 813 (Tex. App.— Dallas 2013, no pet.) (citing *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 140 (Tex. App.— Dallas 2012, no pet.)).

### 1.     Existence and terms of the contract

Houlihan claims no contract can exist because CTI does not allege the existence of a written agreement signed by both parties.  The RFP explicitly stated that "[n]othing contained in this RFP creates, nor shall be construed to create, any contractual relationship between CTI Foods and any supplier. . . . [A]ny binding contractual relationship may be made only in and through a written agreement signed by both parties."  Doc. 30-1 at p. 2.  In other words, Houlihan claims that the RFP created a condition precedent to contract formation which remained unsatisfied.  Doc. 38 at p. 3 (citing *Priest v. Oehler*, 41 S.W.2d 783, 787 (Mo. 1931) ("[I]f the parties make it a condition to the existence of a contract that the terms agreed upon be reduced to writing, and signed by them, there is no contract until this is done.")).  Thus, says Houlihan, the Court must dismiss the claim, as Houlihan and CTI never formed a contract in the first place.

The Court rejects this argument.  Assuming without deciding both that the RFP created a condition precedent to contract formation and that the parties failed to satisfy it, those facts would not preclude later contract formation when the conduct of both parties recognizes the existence of a contract.  Under the UCC,

> Conduct by both parties which recognizes the existence of a contract is sufficient
> to establish a contract for sale although the writings of the parties do not otherwise

establish a contract.  In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

Mo. Rev. Stat. § 400.2-207(3); Tex. Bus. & Com. Code Ann. § 2.207(c) (same); *see also* Mo. Rev. Stat. § 400.2-204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."); Tex. Bus. & Com. Code Ann. § 2.204(a) (same).

An Eighth Circuit case, *White Consolidated Industries, Inc. v. McGill Manufacturing Co.*, applying the identical UCC provision in Minnesota, illustrates this concept.  165 F.3d 1185 (8th Cir. 1999).  In *White*, a seller sent an initial offer of sale to a buyer, and the buyer responded by submitting a purchase order conditioning its acceptance on the seller's assent to a merger clause—that is, a provision that the terms of the buyer's purchase order, alone, expressed the agreement of the parties.  *Id.* at 1190–91.  The seller did not assent, and instead crossed out one of the terms of the purchase order and signed it.  *Id.* at 1191.  The parties proceeded with the sale.  *Id.*  The court held that, though the writings of the parties failed to establish a contract due to the failure to satisfy the buyer's express condition, a contract—without the merger clause— came into being due to the parties' subsequent performance pursuant to UCC § 2-207(3).  *Id.* at 1192.

Assuming as Houlihan says that the writings of the parties do not establish a contract due to the failure of a condition precedent, CTI makes numerous allegations of conduct by both parties that recognizes the existence of a contract.  CTI alleges that both parties performed their obligations for a whole quarter of 2021—in January, February, and March.  Doc. 27 at ¶¶ 22–26. In this situation, the parties' alleged, subsequent conduct recognizing the existence of a contract plausibly alleges the existence of a contract.  *See Axelson, Inc. v. McEvoy-Willis*, *a Div. of Smith*

8

*Int'l (N. Sea), Ltd.*, 7 F.3d 1230, 1233 (5th Cir. 1993) (applying Texas law and holding that

"[b]oth parties . . . commenced performance.  Conduct by both parties recognized the existence

of a contract.").  Because CTI pleads facts that allow the Court to draw the plausible inference

that a contract formed by operation of UCC § 2-207(3), the Court rejects Houlihan's argument

that no contract could exist due to the failure of a condition precedent.

Houlihan also argues that the alleged contract fails for lack of a quantity term.  "Under

the UCC, a contract may exist even though it is missing terms so long as 'there exists a

reasonably certain basis for giving an appropriate remedy.'" *Williams v. Medalist Golf, Inc.*, 910

F.3d 1041, 1045 (8th Cir. 2018) (quoting *Computer Network, Ltd. v. Purcell Tire & Rubber Co.*,

747 S.W.2d 669, 676 (Mo. Ct. App. 1988)); *see also* UCC § 2-201(1) ("A writing is not

insufficient because it omits or incorrectly states a term agreed upon but the contract is not

enforceable under this paragraph beyond the quantity of goods shown in such writing.").

"Ordinarily, a quantity term is essential to granting relief." *Williams*, 910 F.3d at 1045 (citing

*Computer Network Ltd.*, 747 S.W.2d at 676).  The quantity term must be definite; an estimate

does not suffice.  *See id.* ("It is undisputed that the [alleged contract] does not contain a definite

quantity amount, only an estimate.").

Because the RFP itself only *estimates* that CTI will require 3.2 million pounds of frozen

chicken breast trim in 2021 and states that the estimate "does not constitute a commitment by

CTI Foods to purchase a given quantity of any item," Doc. 30-1 at p. 2, Houlihan contends that

CTI fails to plead a definite quantity term.  But the RFP also states that "CTI Foods will make

that commitment based upon need." *Id.*  Assuming the estimated quantities in the RFP do not

suffice on their own, Houlihan's argument ignores both CTI's allegation that Houlihan itself

supplied a definite quantity term when its representative told CTI that "Houlihan could provide

9

approximately one truckload per week of frozen chicken breast trim at a set price of 69¢ per

pound, plus spot help as needed," as well as CTI's allegation that it accepted Houlihan's offer.

Doc. 27 at ¶¶ 15, 22.  Assuming a truckload contains about 40,000 pounds of trim, *see id.* at ¶¶

24, 25, 26, Houlihan allegedly offered to provide a little over 2,000,000 pounds of meat to CTI,

over a million pounds less than CTI's RFP quantity estimate.  Because Houlihan does not even

mention these allegations, let alone address the effect of its alleged offer and CTI's alleged

acceptance, Houlihan has not met its burden to show that CTI fails to state a claim for lack of a

quantity term.

### 2.      Statute of frauds

Houlihan next argues that the statute of frauds bars CTI's breach-of-contract claim

because CTI alleges only an oral, unwritten acceptance and the alleged writings lack a quantity

term.  The UCC statute of frauds provides that

> [A] contract for the sale of goods for the price of five hundred dollars or more is
> not enforceable by way of action or defense unless there is some writing sufficient
> to indicate that a contract for sale has been made between the parties and signed by
> the party against whom enforcement is sought or by his authorized agent or broker.

Mo. Rev. Stat. § 400.2-201(1); Tex. Bus. & Com. Code Ann. § 2.201(a) (same).  "The required

writing need not contain all the material terms of the contract and such material terms as are

stated need not be precisely stated."  UCC § 2.201 cmt. 1.  "The only term which must appear is

the quantity term which need not be accurately stated but recovery is limited to the amount

stated."  *Id.*  To satisfy the statute of frauds, the writing "may comprise several writings that, in

combination, supply the essential terms."  *Vess Beverages, Inc. v. Paddington Corp.*, 941 F.2d

651, 654 (8th Cir. 1991) (applying Missouri law).

Although Missouri's codification of the common-law statute of frauds, Mo. Rev. Stat. §

432.010, differs from the state's UCC statute of frauds, Mo. Rev. Stat. § 400.2-201(1), the cases

10

interpreting the former inform analysis of the latter when the text of the UCC does not provide

an answer.  *See Cub Cadet Corp. v. Mopec, Inc.*, 78 S.W.3d 205, 209 (Mo. Ct. App. 2002)

("Indeed, the UCC has not completely displaced the common law.  Section 400.1-103 states that

'unless displaced by the particular provisions of this chapter, the principles of law and equity . . .

shall supplement [the Code's] provisions.'" (alterations in original and italics omitted)); *cf. Mika*

*v. Cent. Bank of Kansas City*, 112 S.W.3d 82, 90 (Mo. Ct. App. 2003) (applying common-law

statute-of-frauds fraud exception to the statutory credit-agreement statute of frauds and noting

that "[u]nless a statute clearly abrogates the common law either expressly or by necessary

implication, the common law rule remains valid.") (quoting *State ex rel. Brown v. III Invs., Inc.*,

80 S.W.3d 855, 860 (Mo. Ct. App. 2002)).  Courts appropriately cite common-law cases when

interpreting the UCC statute of frauds.  *See, e.g.*, *Int'l Casings Group, Inc. v. Premium Std.*

*Farms, Inc.*, 358 F. Supp. 2d 863, 874 (W.D. Mo. 2005), *amended*, No. 04-1081-CV-W-NKL,

2005 WL 8159075 (W.D. Mo. Apr. 14, 2005) (a UCC statute-of-frauds case relying on a

common-law statute-of-frauds case, *Vess Beverages, Inc.*, 941 F.2d at 651).

CTI alleges that it "accepted Houlihan's offer via a telephone conversation between

Griffin and Lansdell on December 16, 2021," Doc. 27 at ¶ 22, which Houlihan argues does not

satisfy the statute of frauds.  Houlihan understandably cites *ARG International, AG v. Olin*

*Corporation*, a decision holding that Missouri's statute of frauds "requires all elements of a

contract, offer and acceptance, to be in writing."  --- F. Supp. 3d ----, 2022 WL 103301, at *2

(E.D. Mo. Jan. 11, 2022), *appeal filed*, No. 22-1217 (8th Cir. Jan. 31, 2022).  Despite this

statement, the Court's research has not identified a reported state-court decision in Missouri or

Texas adopting such a hard-and-fast rule—likely due to the plain language of the statutes, which

require only "some writing sufficient to indicate that a contract for sale has been made . . . signed

11

by the party against whom enforcement is sought . . . ."  Mo. Rev. Stat. § 400.2-201(1); Tex.

Bus. & Com. Code Ann. § 2.201(a).

Indeed, Missouri courts have long recognized that a party may orally accept a contract

subject to the statute of frauds.  *See e.g.*, *Black v. Crowther*, 74 Mo. App. 480, 483 (1898) ("If

the written proposal contains sufficient memoranda to otherwise meet the requirements of the

statute, the acceptance may be oral."); *Anderson v. Hall*, 202 S.W. 539, 541 (Mo. 1918).  That

said, the writing must "indicate the consummation of a contract, not mere negotiations."

*Howard Const. Co. v. Jeff-Cole Quarries, Inc.*, 669 S.W.2d 221, 227 (Mo. Ct. App. 1983).  CTI

alleges oral acceptance of the alleged contract; but absent binding authority to the contrary, the

Court rejects Houlihan's argument that this compels dismissal.

The Court also rejects Houlihan's argument that CTI fails to satisfy the statute of frauds

because no writing establishes a quantity term.  As previously mentioned, CTI alleges the

existence of at least two writings that, in combination, supply a quantity term and indicate the

consummation of a contract:  the November 30, 2022, e-mail from Houlihan to CTI stating that

Houlihan could provide approximately one truckload per week of frozen chicken-breast trim,

along with the April 2021 e-mail from Houlihan to CTI acknowledging that Houlihan had been

"honoring our deal."  Doc. 27 at ¶¶ 15, 18, 22, 31.

### B.   Promissory estoppel

Houlihan next argues that CTI fails to state a promissory estoppel claim for four reasons:

CTI fails to allege (1) a definite promise and (2) reasonable reliance; (3) CTI inappropriately

seeks money damages on the claim; (4) and the statute of limitations bars the claim.  The Court

addresses each in turn.

12

In Missouri, "[a] claim of promissory estoppel has four elements:  (1) a promise; (2) on which a party relie[d] to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (citing *Zipper v. Health Midwest*, 978 S.W.2d 398, 411 (Mo. Ct. App. 1998)).  A Texas promissory-estoppel claim has similar elements.  *See Trevino & Assocs. Mechanical, L.P. v. Frost Nat. Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.) ("The elements of a promissory estoppel claim are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial detrimental reliance by the promisee.")  The promise "must be definite, and . . . made in a contractual sense." *Clevenger*, 237 S.W.3d at 590 (citing *Zipper*, 978 S.W.2d at 411); *see Walker v. Walker*, 631 S.W.3d 259, 265 (Tex. App.—Houston [14th Dist.] 2020, no pet.).  Further, "a promisee seeking to enforce a promise under the doctrine of promissory estoppel must show that his or her reliance on the promise was reasonable." *Blackburn v. Habitat Dev. Co.*, 57 S.W.3d 378, 387 (Mo. Ct. App. 2001) (quoting *Delmo, Inc. v. Maxima Elec. Sales, Inc.*, 878 S.W.2d 499, 505 (Mo. Ct. App. 1994)); *see Walker*, 631 S.W.3d at 265.

First, Houlihan says CTI fails to plausibly allege a definite promise because the quantity estimates in the RFP all cautioned that they do not "constitute a commitment by CTI foods to purchase a given quantity of any item."  Doc. 30-1 at p. 2.  But the RFP also states that "CTI Foods will make that commitment based upon need." *Id.*  Houlihan's argument fails to consider the entirety of the promise CTI alleges.  CTI alleges that "Houlihan promised to have delivered approximately 3.2 million pounds of frozen chicken-breast trim to CTI in increments of approximately one truckload per week, at a set price of 67 cents per pound in 2021."  Doc. 27 at ¶ 45.  While the 3.2-million-pounds figure comes from the estimate in CTI's RFP, the one-

truckload-per-week figure was a quantity commitment allegedly made by Houlihan in Griffin's

November 30, 2020, e-mail.  *See id.* at ¶ 15.  Moreover, CTI alleges that it accepted Houlihan's

offer, which could plausibly serve as CTI's "commitment based upon need."  *Id.* at 22; Doc. 30-1

at p. 2.  As Houlihan does not address the effect of Griffin's e-mail or CTI's alleged acceptance,

the Court rejects Houlihan's argument that CTI fails to allege a definite promise.

Second, Houlihan argues that CTI's promissory-estoppel claim fails because "CTI's

alleged reliance on Houlihan's supposed promise was unreasonable as a matter of law."  Doc. 30

at p. 7.  "Reasonable reliance can be inferred by the facts and circumstances surrounding the

promise and the actions taken by Plaintiff."  *Hernandez v. UPS Supply Chain Sols., Inc.*, 496 F.

Supp. 2d 778, 785 (W.D. Tex. 2007).  CTI alleges that it relied on Houlihan's promise when it

awarded the bid for trim meat to Houlihan, did not seek additional bids, and did not contract with

any other vendors for the same product.  Doc. 27 at ¶ 46.  On the other hand, Houlihan says that

"a party may not use promissory estoppel to circumvent the agreed terms by the parties."  Doc.

30 at p. 8 (citing *Am. Realty Tr., Inc. v. First Bank of Missouri, Gladstone*, 902 S.W.2d 884, 887

(Mo. Ct. App. 1995)).  Houlihan points to the language of the RFP disclaiming any contract

outside of a written agreement signed by both parties and says CTI could not reasonably rely on

a promise not written down and signed by them both.  However, this argument contains an

inconsistency because Houlihan claims never to have contracted with CTI.  *See* Doc. 30 at p. 8

("a party may not use promissory estoppel to circumvent *the agreed terms by the parties*."

(emphasis added)).  Moreover, as discussed above, even assuming the RFP provided an effective

condition precedent, CTI alleges—at the very least—the existence of a contract without such a

condition precedent by operation of UCC § 2-207(3).  Further, Houlihan's alleged partial

performance of the alleged contract provided CTI good reason to rely on the alleged promise.

Doc. 36 at p. 7.  The Court rejects Houlihan's argument that CTI failed to allege reasonable reliance.

Third, Houlihan argues that CTI exclusively pleaded a *Missouri* promissory-estoppel claim, and the Court must dismiss this claim because CTI seeks only money damages and not specific performance.  *See Birkenmeier v. Keller Biomedical, LLC*, 312 S.W.3d 380, 389 (Mo. Ct. App. 2010) (affirming dismissal of promissory estoppel claim because "Birkenmeier was not seeking specific enforcement of the promise, and was instead seeking a remedy at law").  However, CTI explicitly prayed for "any other relief to which CTI may be justly entitled at law or at equity" in its counterclaim.  Doc. 27 at p. 10.  Even assuming CTI only brings a Missouri promissory-estoppel claim, because CTI seeks equitable relief, the Court rejects Houlihan's argument that the promissory-estoppel claim seeks an improper remedy.

That said, paragraph 44 of CTI's counterclaim hardly models clarity.  The paragraph reads:  "Pleading alternatively, under Missouri Law, a claim for promissory estoppel allows the courts to enforce a promise on equitable grounds even if the parties have not entered into a contract. . ."  Doc. 27 at ¶ 44.  The parties dispute whether the prepositional phrase "under Missouri law" modifies the phrase coming before or after it.  To clear up the ambiguity, the Court grants CTI the leave it requests to amend count 2 of its counterclaim to clarify that it does not seek to limit itself to a promissory-estoppel claim under Missouri law.  *See* Doc. 36 at p. 8 n.3.

Finally, Houlihan argues that the statute of frauds bars CTI's promissory-estoppel claim on the same grounds it argued the statute bars CTI's breach-of-contract claim.  Doc. 30 at pp. 10–12.  The Court rejects this argument for the reasons stated in Part III.A.2.

15

**IV.      Conclusion**

The Court denies Houlihan's [29] motion to dismiss CTI's counterclaim and grants CTI

leave to amend its counterclaim to the extent described in this order.  CTI must amend its

counterclaim no later than April 8, 2022.

So Ordered this 1st day of April 2022.

_____
STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE

16