UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

HOULIHAN TRADING COMPANY,    )
                             )
           Plaintiff(s),     )
                             )
      vs.                    )        Case No. 4:21-cv-01030-SRC
                             )
CTI FOODS, LLC,              )
                             )
           Defendant(s).     )

**<u>Memorandum and Order</u>**

For years before their business relationship spoiled, Houlihan regularly supplied CTI with substantial amounts of poultry products.  And for the first three months of 2021, CTI Foods ordered, and Houlihan supplied, a number of truckloads of frozen chicken trim each month. Then problems began to crop up.   In March, Houlihan informed CTI that due to extreme market conditions caused by the Covid-19 pandemic, it could no longer supply any chicken from CTI's approved suppliers.  When CTI threatened to sue for breach of contract, Houlihan sued CTI for a declaratory judgment.  CTI responded with a two-count counterclaim alleging breach of contract and promissory estoppel.  Houlihan has now filed a [58] motion for summary judgment, arguing: (1) that the parties contracted on an order-by-order, not yearly, basis, and therefore Houlihan did not breach any alleged yearlong contract for the supply of chicken trim; and (2) that even if the parties entered a yearlong contract, the doctrine of commercial impracticability relieved Houlihan of its contractual obligations.  For its part, CTI has filed a competing [62] motion for partial summary judgment, arguing that the parties entered—and Houlihan breached—a valid and enforceable installment contract for approximately one load of trim per week at 67 cents per pound throughout 2021.

## I.     Background

For years, Houlihan regularly supplied CTI with large quantities of poultry products.
Doc. 73 at ¶¶ 3, 5.  Houlihan is a Missouri trading company specializing in wholesale poultry
distribution.  It does not own or farm poultry; rather, it procures poultry for foodservice
manufactures from farms and suppliers.  Doc. 71 at ¶¶ 3, 4.  CTI is a Texas-based custom food
service manufacturer that supplies restaurants and branded food companies with food products.
*Id.* at ¶ 1; Doc. 73 at ¶ 2.  On November 13, 2020, CTI's Jason Lansdell sent a request for
proposal ("RFP") to several poultry suppliers, including Houlihan, soliciting per-pound price
quotes for frozen chicken breast trim for the 2021 calendar year.  Doc. 71 at ¶¶ 6, 9, 11.  The
body of Lansdell's email said, in part, "This RF[P] pricing will be through the time period of
January 1, 2021 through December 31, 2021."  *Id.* at ¶ 6 (citing Exh. A); Doc. 65 at p. 5.  CTI's
Lansdell attached to the email the RFP, which included a spreadsheet in which suppliers could
enter quote information.  Doc. 71 at ¶ 6 (citing Exh. B); Doc. 65 at pp. 37–39.  CTI estimated in
the RFP that it would need 3,203,229 pounds of trim in 2021.  Doc. 71 at ¶ 7.  The RFP also
stated that "[e]ach bid submitted by a supplier shall constitute an offer to supply in accordance
with this RFP."  Doc. 65 at p. 38.  After receiving the RFP, Houlihan's Travis Griffin began
attempting to secure trim commitments from CTI-approved suppliers,  Doc. 71 at ¶¶ 17–20, and
Griffin and Lansdell began negotiating.  *Id.* at ¶ 22.

The negotiations took place over email exchanges, RFP forms, and telephone
conversations.  Houlihan's Griffin first replied to the RFP with an email that said, "This is what
[Houlihan] can do for 2021 . . . .  1. Frozen 15DN Breast Trim @ .69 Del / approx. 1 load per
week."  Doc. 71 at ¶ 23 (quoting Exh. F); Doc. 65 at p. 47.  A load contains approximately
40,000 pounds of trim, and CTI asserts it can contain up to 42,000 pounds.  Doc. 73 at ¶ 5.  One

load per week for one year at 40,000 pounds per load amounts to 2,080,000 pounds of trim.  At 42,000 pounds per load, a year's supply would equal 2,184,000 pounds.

Griffin emailed Lansdell the completed CTI RFP spreadsheet containing the 69-cent-per-pound quote and estimate of 3,203,229 pounds.  Doc. 71 at ¶ 24 (citing Exh. H); Doc. 65 at ¶ 51–54.  Lansdell then called Griffin and asked if Houlihan could drop its price to 67 cents per pound.  Doc. 71 at ¶ 26.  In the meantime, Griffin had set about securing suppliers.  On December 10 or 11, Griffin stated that Houlihan could supply trim at 67 cents per pound, sending him a revised RFP that reflected the new price and retained the 3,203,229-pounds estimate.  Doc. 71 at ¶¶ 28, 29.  Griffin wrote in the body of that email: "Frozen Chicken B/S Breast Trim . . . @ .67 . . . Set Price 2021."  *Id.* at ¶ 31 (quoting Exh. J); Doc. 65 at p. 58.  CTI construed that email as an offer, and it asserts that Lansdell accepted that offer over a telephone conversation with Griffin on December 16.  Notably, Houlihan disputes that any such conversation occurred.  Doc. 71 at ¶¶ 49–51.  On December 11, Griffin emailed a supplier regarding the potential CTI contract, "I can lock up 2-4 [loads] per month for 2021. . . . Starting January 2021-December2021 [sic]."  *Id.* at ¶ 28, 35 (quoting Exh. L); Doc. 65 at p. 67.

On December 14, 2020, Griffin emailed two employees at CTI, "I believe we have a new deal for 2021 @ .67 Delivered for the year on 15DN breast trim.  I worked with Jason Lansdell putting this together for you girls."  *Id.* at ¶ 47 (quoting Exh. O); Doc. 65-1 at p. 3.  One of the CTI employees, Rayla Blevins, responded, "Can you get me . . . six loads in January?"  Doc. 71 at ¶ 48 (quoting Exh. O); Doc. 65-1 at p. 3.  Griffin replied, "I can get them all done. . . . Please send 6 New PO's [i.e., purchase orders] for January @ .67 Delivered (New Price for 2021 – set)," and Blevins sent the purchase orders two days later.  Doc. 71 at ¶ 52 (citing Exh. O); Doc. 65-1 at pp. 2–3.

3

CTI ordered a number of loads of trim each month for the months of January, February and, March, and Houlihan fulfilled those orders at 67 cents per pound, though the parties disagree on exactly how many loads the parties ordered and delivered throughout those three months:  CTI contends it ordered 13 loads, while Houlihan contends that CTI ordered, and Houlihan supplied, 17 loads.  Doc. 71 at ¶¶ 55–58.  In February 2021, Lansdell inquired about CTI's orders for February and March: "[A]re these loads at our agreed to frozen pricing?" Griffin replied, "Yes sir – everything at .67."  *Id.* at ¶¶ 60, 61 (quoting Exh. P); Doc. 65-1 at p. 6.

Houlihan began facing difficulties sourcing trim soon after the parties began performing. Griffin emailed Frank Sorba at Innovative Solutions in late January:  "I had a verbal contract 4 weeks ago [with a supplier] for 2-4 loads for CTI for all of 2021 and I started pulling loads already in January....... and now - [the supplier is] telling me they can't commit.  CTI uses 1 load every week."  Doc. 71 at ¶ 64 (quoting Exh. Q); Doc. 65-1 at p. 9.  Griffin sought to hold suppliers to their commitments to supply trim for the year.  *See* Doc. 71 at ¶ 64 (quoting Exhs. M, N, T); Doc. 65 at pp. 70–79; Doc. 65-1 at pp. 19–32.  In March, Houlihan supplied trim to CTI for the last time.  Doc. 71 at ¶ 84.  In late March, after CTI ordered loads of trim for April, Griffin emailed Lansdell and other CTI employees,

> I've left a voicemail for [Lansdell] this am [sic] to discuss options to supply chicken for the next 4-8 weeks.  I do not have confirmations on PO's for April from any supplier of frozen trim.  Frozen breast trim is completely gone across the board with all approved suppliers. . . . I know you guys will need chicken.  Options: Work on getting fresh in to cover for a few months until this changes / Only frozen available are from non-approved suppliers, they don't want to do all the paperwork for approval.

*Id.* at ¶ 69 (quoting Exh. W); Doc. 65-1 at p. 39.  On April 5, after Griffin alerted Lansdell that suppliers were still "showing zero inventory," Lansdell responded, "What about fresh? Are you not going to honor the contract with fresh?"  Doc. 71 at ¶ 71 (quoting Exh. X); Doc. 65-1 at pp.

4

43–44.  Griffin responded that they did not have a "deal" on fresh product, and Lansdell replied that "[i]t is the same product going into the same finished goods, how you bring it in the door makes no difference to us.  If you are saying you are not going to honor our agreement and skip out on the technicality of frozen vs. fresh, we are going to have significant issues with that." Doc. 71 at ¶ 71 (citing Exh. X); Doc. 65-1 at p. 43.

On April 15, Lansdell emailed a supplier directly to inquire about fresh trim, and the supplier told Lansdell, "If & when we have opportunities on fresh it would be week to week for the rest of Q2."  Doc. 73 at ¶ 65 (citing Exh. 5); Doc. 60-5 at p. 3.  In that exchange, Lansdell told the supplier it would "not be working through Houlihan Trading on this product."  Doc. 73 at ¶ 68 (quoting Exh. 5); Doc. 60-5 at p. 3.  Lansdell contacted other suppliers as well.  Doc. 60-2 at pp. 51–53.  On April 24, Griffin emailed Lansdell,

> More than anything I hate to be the bearer of bad news but in speaking with our main suppliers, we have been told that all contracts are void due to lack of product. Citing the pandemic's unforeseen issues; which, has created nationwide problems. . . . We have enjoyed years of partnership with CTI . . . . Please know how sorry we are to be in this unusual circumstance, but who could have predicted the pandemic related issues.

Doc. 71 at ¶ 78 (quoting Exh. Z); Doc. 65-1 at pp. 50–51.  Lansdell followed up one last time in May, asking Griffin if he had "been able to secure any trim product to fulfill the contract." Griffin replied, "No sir, contract is over because there is no product and you have chosen to call our customers directly and bypass Houlihan."  Doc. 71 at ¶¶ 81, 82; Doc. 65-1 at pp. 53–54.  In July, CTI put Houlihan on notice of a potential lawsuit.  Doc. 71-1 at p. 2.

Houlihan won a race to the courthouse and filed a declaratory-judgment action seeking a declaration that no valid contract existed between the parties or, alternatively, a declaration that the doctrine of commercial impracticability relieved Houlihan of its contractual obligations.

5

Doc. 7 at p. 6.  CTI filed a counterclaim, seeking damages for Houlihan's alleged breach of the parties' contract.  Doc. 47 at pp. 10–12.

## II.    Standard and Applicable Law

The parties agree that Missouri or Texas law applies to this case.  Having reviewed the relevant laws of Missouri and Texas, the Court concludes that the legal principles involved, rooted as they are in the Uniform Commercial Code and common law of contracts, do not conflict.  Because Missouri and Texas law do not conflict in any relevant respect, the Court need not engage in a conflict-of-laws analysis.  *Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996).  And Missouri law, as law of the forum, controls.  *Id.* (quoting *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 613 (9th Cir. 1975)).

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Rule 56(a) also provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support will not suffice to defeat summary judgment.  *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  The Federal Rules "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 280 (1968)).

"Where . . . each side moves for summary judgment, each concedes that for purposes of his own motion there is no genuine factual issue; however, the fact that both sides move for summary judgment does not necessarily establish that the case is a proper one for summary disposition under the Rule."  *Young v. Sw. Bell Tel. Co.*, 309 F. Supp. 475, 476 (E.D. Ark. 1969), *aff'd,* 424 F.2d 256 (8th Cir. 1970).  "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."  *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).  "Although it is well-settled that the court must decide each motion for summary judgment on its own merits, this does not mean that 'each motion must be considered in a vacuum. Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time,' applying the same standards to each motion."  *Wells Real Est. Inv. Tr.*

*II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 51 (1st Cir. 2010) (quoting *P.R. Am. Ins. Co. v. Rivera–Vazquez*, 603 F.3d 125, 133 (1st Cir. 2010)).

## III.   Discussion

Both parties seek judgment on:  (1) Houlihan's claim for declaratory relief regarding its commercial-impracticability defense; (2) Houlihan's statute-of-frauds affirmative defense; and (3) Houlihan's lack-of-consideration affirmative defense.  Doc. 58; Doc. 62.  CTI alone seeks summary judgment on its breach-of-contract counterclaim, except for damages, and on Houlihan's remaining affirmative defenses.  Houlihan alone seeks judgment on its claim for declaratory relief as to the nonexistence of a yearlong contract, on damages on CTI's breach-of-contract claim, and on CTI's promissory-estoppel claim.  The Court addresses each motion separately, applying the above standards.

### A.   CTI's Motion for Summary Judgment

CTI moves for partial summary judgment on its breach-of-contract counterclaim.  To succeed, a plaintiff must prove: "(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff."  *Moore v. Armed Forces Bank, N.A.*, 534 S.W.3d 323, 327 (Mo. Ct. App. 2017) (citing *Keveney v. Mo. Mil. Acad.*, 304 S.W.3d 98, 104 (Mo. 2010)).  CTI also seeks judgment on Houlihan's commercial-impracticability defense and affirmative defenses.  Doc. 62.  The Court first addresses the breach-of-contract elements (other than damages), then Houlihan's affirmative defenses, then Houlihan's commercial-impracticability defense.

8

1.    **Genuine issues of fact exist as to material contract terms.**

CTI asks the Court to find that the parties' conduct and communications created a valid installment contract that obligated CTI to order—and Houlihan to supply—2,080,000 pounds of frozen chicken breast trim over the course of the 2021 calendar year.  Doc. 62 at p. 4; Doc. 78 at pp. 6–7.  As noted above, 2,080,000 pounds amounts to one load of trim per week for the year, assuming a load contains 40,000 pounds of trim.  Doc. 73 at ¶ 5.  CTI has not met its burden in showing a valid contract because genuine issues of material fact exist as to whether the parties mutually assented to a quantity term.

The UCC provides that "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract" and that "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined."  Mo. Rev. Stat. § 400.2-204(1)–(2).  The Official Comment to this provision states that the provision promotes "the basic policy of recognizing any manner of expression of agreement, oral, written or otherwise."  Mo. Rev. Stat. § 400.2-204 cmt.  "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."  Mo. Rev. Stat. § 400.2-204(3).

"Ordinarily, a quantity term is essential to granting relief."  *Williams v. Medalist Golf, Inc.*, 910 F.3d 1041, 1045 (8th Cir. 2018) (citing *Comput. Network, Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 674 (Mo. Ct. App. 1988)); *see Silicon Int'l Ore, LLC v. Monsanto Co.*, 314 P.3d 593, 602 (Idaho 2013) (Verbal agreement was too indefinite to fashion a remedy under Idaho's identical codification of section 2-204(3) of the UCC because, among other things, "[t]here [was] no specific quantity term in the agreement" and "[a] court cannot enforce a

contract unless it can determine what it is." (quoting 1 Arthur L. Corbin, *Corbin on Contracts* § 4.1 (rev. ed. 1993))); 2 R. Anderson, *Uniform Commercial Code* § 2-204:145 (3d ed.) (Under the UCC, "[t]he court can supply any missing term except a quantity term."). While the UCC allows parties to form a contract through "any manner sufficient to show agreement," Mo. Rev. Stat. § 400.2-204(1), it also "continues the common-law principle that the intent of the parties to make a contract must be manifested." *Comput. Network*, 747 S.W.2d at 674. The Court accordingly reviews of the parties' conduct in light of the basic principles of contract law.

A valid contract requires: (1) mutuality of agreement, (2) legal consideration, (3) mutuality of obligation, (4) parties competent to contract, and (5) proper subject matter. *Id.* at 675 (first citing *Bengimina v. Allen,* 375 S.W.2d 199, 202 (Mo. Ct. App. 1964); and then citing 2 R. Anderson, *Uniform Commercial Code* § 2-204:11). Houlihan argues that CTI never manifested assent to a quantity term and therefore mutuality of agreement did not exist, so the Court considers whether CTI has met its burden as to the first element.

The UCC "focuses upon 'mutuality of assent as manifested by the conduct of the parties' in place of the 19th century's subjective test of intent." *Id.* at 674 (first quoting *Am. Web Press, Inc. v. Harris Corp.,* 596 F. Supp. 1089, 1091–92 (D. Colo. 1983); and then citing *Euclid Eng'g Corp. v. Ill. Power Co.*, 223 N.E.2d 409, 413 (Ill. App. Ct. 1967)). As noted, "a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Mo. Rev. Stat. § 400.2-204(3). But Houlihan argues, in effect, that the parties' conduct does not offer a reasonably certain basis for giving an appropriate remedy because that conduct does not objectively manifest the parties' mutual assent to a quantity term. Doc. 70 at pp. 3–9.

In arguing that a quantity term exists, CTI primarily relies on a December email from Houlihan's Griffin, which CTI characterizes as an offer.  Doc. 63 at pp. 17–18.  That email contained an RFP spreadsheet that Griffin had filled out and said, "Please see attached (revised) pricing for 2021—15DN to KY; Frozen Chicken B/S Breast Trim /Wax Cases / 15DN @ .67 Delivered KY / Set Price 2021."  Doc. 71 at ¶ 28 (quoting Exh. J): Doc. 65 at pp. 58–61.  The attached RFP contained a quantity estimate of 3,203,229 pounds of frozen chicken breast trim.  Doc. 65 at p. 61.  Notably, however, CTI does not point to the RFP's 3,203,229-pound estimate as the quantity that Houlihan allegedly offered; instead, it points to a November 30 email from Griffin that said, "This is what [Houlihan] can do for 2021 . . . . 1. Frozen 15DN Frozen Breast Trim @ .69 Del / *approx. 1 load per week*."  Doc. 71 at ¶ 22 (citing Exh. F) (emphasis added); Doc. 65 at p. 47; Doc. 74 at p. 7.  CTI claims it accepted this alleged offer—containing the price term of 67 cents per pound from the December email and the quantity term of "approx. 1 load per week" from the November email—over the phone.  Doc. 71 at ¶ 51.

Houlihan, for its part, disputes both CTI's characterization of the December email as an offer and CTI's assertion that CTI accepted the "offer."  In fact, Houlihan says CTI never accepted *any* offer, over the phone or otherwise.  *Id*. at ¶¶ 49, 51.  Accordingly, genuine issues of fact exist as to offer and acceptance here.  But those issues of fact do not necessarily sound the death knell of CTI's motion because the Court need not pinpoint the timing of offer and acceptance to find a contract based on the parties' conduct.  *See* Mo. Rev. Stat. § 400.2-204(1)–(2).  That conduct, however, must objectively manifest mutual assent to a quantity of trim for 2021 such that a "reasonably certain basis for giving an appropriate remedy" exists.  Mo. Rev. Stat. § 400.2-204(3); *Comput. Network*, 747 S.W.2d at 676.

11

The Court, then, turns to the parties' conduct.  CTI asserts that it ordered—and Houlihan supplied—"approximately one load [of trim] per week" for the first quarter of 2021, for a total of 13 loads.  Doc. 71 at ¶¶ 55–57.  Houlihan agrees that it supplied the loads that CTI ordered during that quarter, but it numbers those loads at 17—not 13.  *Id.*  The dispute of fact regarding the number of loads actually delivered, standing alone, casts doubt on whether CTI has sufficiently proven mutual assent on quantity.  The Court must have a reasonably certain basis to fashion a remedy, Mo. Rev. Stat. § 400.2-204(3), but a dispute exists as to what the "approximately one load per week" amounts to annually—if the Court were to accept CTI's figure, it may be 52 loads, while if the Court were to accept Houlihan's, it may be 68, over 30% more.

That said, undisputed emails illustrate how CTI set about ordering loads.  For example, in December of 2020, Griffin emailed CTI's Rayla Blevins, asking for "6 New [purchase orders] for January @ .67 Delivered (New Price for 2021 – set)."  Doc. 71 at ¶ 48 (quoting Exh. O); Doc. 65-1 at p. 2.  Blevins responded with six separate purchase-order numbers for January.  Doc. 71 at ¶ 52 (citing Exh. O); Doc. 65-1 at p. 2; *see also* Doc. 71 at ¶¶ 56–57.  CTI asserts that ordering such loads constituted "performing its obligations under the Contract."  Doc. 71 at ¶ 54.  Houlihan, disputing that assertion, claims that the parties "were proceeding with business as they had been for 17 years—on a [purchase order] by [purchase order] basis."  *Id.* (citing Doc. 65-10 at pp. 92–93).

The parties' conduct in terms of quantities ordered and the manner of ordering neither proves nor disproves CTI's assertion that the parties mutually assented to a quantity term.  This conduct *could* support a factual finding that an installment contract for "approximately one load [of trim] per week" (whatever that really means) existed.  *See* Mo. Rev. Stat. § 400.2-612.  Yet,

it could also support a factual finding that CTI intended to transact business on an order-by-order, load-by-load basis.  Houlihan argues, pointing to Griffin's deposition, that the latter possibility would reflect the parties' historic course of dealing.  Doc. 71 at ¶ 54 (citing Doc. 65-10 at pp. 92–93).  In *Computer Network*, the Court found mutual assent to a quantity term of 21 computers—even though the buyer intended to purchase a lesser number—because both parties signed a letter explicitly containing the quantity term.  747 SW.2d at 677.  Here, in contrast, the Court sees no such indication that the parties were on the same page as to a quantity term.  Further, in *Williams*, the Eighth Circuit noted that a contract need not contain precise quantity term if it is a requirements contract.  910 F.3d at 1045.  But here, CTI expressly "contends that the Contract was an 'installment contract'—not a 'requirements contract.'"  Doc. 81 at p. 5.

The parties' conduct discussed here, without more, does not establish mutual assent to a quantity term, nor does CTI point to any other writings or instances of conduct that objectively manifest mutual assent to a quantity term such that the Court could have a reasonably certain basis to fashion a remedy.  Mo. Rev. Stat. § 400.2-204(3).  To award a damages remedy, the Court would need to have a reasonably certain quantity on which to base the award; similarly, were CTI to have sought specific performance, the Court would need to have a reasonably certain quantity to order Houlihan to provide.  Before the Court can fashion any remedy, a jury must resolve the genuine issues of material fact that exist due to the parties' disparate evidence on quantity.

CTI, accordingly, has not met its burden of showing the absence of any genuine issue of material fact as to mutual assent to a quantity term.  *See Liberty Lobby*, 477 U.S. at 250; Fed. R. Civ. P. 56(a).  Indeed, at least three issues of material fact exist as to any quantity term: (1) whether CTI objectively manifested assent to any set quantity of trim for 2021 (versus

13

contracting on an order-by-order basis), and, if the parties did agree on quantity, (2) whether that quantity amounts to "approximately one load per week" or some other figure, and (3) if the former, what that annualized quantity might actually be.  Because these issues of fact alone suffice to bar summary judgment, the Court does not proceed to the other elements of a valid contract.  The Court cannot find the existence of a contract here in light of the fact issues; therefore, it does not proceed to consider the other two elements of the counterclaim on which CTI seeks judgment, i.e., that the parties performed under the contract and that Houlihan breached the contract.  The Court denies CTI's motion as to its breach-of-contract counterclaim.  *See* Fed. R. Civ. P. 56(a); *Liberty Lobby*, 477 U.S. at 250.

## 2. Houlihan's affirmative defenses of waiver, equitable estoppel, laches, and unclean hands fail as to CTI's breach-of-contract counterclaim, and the Court does not reach the others.

CTI seeks judgment on Houlihan's six affirmative defenses:  (1) waiver; (2) equitable estoppel; (3) laches; (4) unclean hands; (5) lack of consideration; and (6) statute of frauds.  Doc. 48 at p. 12.  The Court considers each in turn, granting CTI's motion as to the first four and denying it as to the last two.

Despite its name, the doctrine of equitable estoppel applies under Missouri law to both claims in equity and at law.  *Charter Commc'ns Operating, LLC v. SATMAP Inc.*, 569 S.W.3d 493, 510 (Mo. Ct. App. 2018) (quoting *State ex rel. Beisly v. Perigo*, 469 S.W.3d 434, 440 (Mo. 2015)).  "The doctrine . . . seeks to foreclose one from denying his own expressed or implied admissions which have in good faith and in pursuance of its purpose been accepted and relied upon by another."  *Id.* at 509 (quoting *Lake St. Louis Cmty. Ass'n v. Ravenwood Props., Ltd.*, 746 S.W.2d 642, 646 (Mo. Ct. App. 1988)).  The doctrine has three elements:  "first, there must be an admission, statement, or act by the person to be estopped that is inconsistent with the claim that

is later asserted and sued upon; second, there must be action taken by a second party on the faith of such admission, statement, or act; and third, an injury must result to the second party if the first party is permitted to contradict or repudiate his admission, statement, or act." *Id.* (quoting *Lake St. Louis*, 746 S.W.2d at 646). "Liberal application of the doctrine of equitable estoppel is not favored," and "courts restrict its use to only those cases in which each element clearly appears, with the burden resting on the party asserting estoppel to establish the essential facts by clear and satisfactory evidence." *Id.* (quoting *Lake St. Louis*, 746 S.W.2d at 646).

CTI argues that no facts support this defense and that, in fact, the record shows that Houlihan cannot make a showing of the elements. In response, Houlihan has not come forward with facts making a showing of the elements, much less the required showing by "clear and satisfactory evidence." *Id.* (quoting *Lake St. Louis*, 746 S.W.2d at 646). The first element requires a showing that CTI made an admission, statement, or act inconsistent with its breach-of-contract claim. In opposing CTI's motion, Houlihan points to no such admission, statement, or act in the record but instead offers conclusory arguments. *Id.* (quoting *Lake St. Louis*, 746 S.W.2d at 646); *see* Doc. 70 at p. 16 (devoting only four sentences to its defenses of waiver, unclean hands, and equitable estoppel). Houlihan asserts without argument or elaboration that CTI (1) "rejected loads of frozen trim that Houlihan offered it, even when it knew there were industry-wide shortages" and (2) "attempted to circumvent Houlihan by going directly to Houlihan's suppliers and telling them that it was no longer doing business with Houlihan." Doc. 70 at p. 16. Regarding the "rejected loads," the Court assumes that Houlihan here refers to a January 2021 email exchange between Griffin and a CTI employee. Griffin wrote, "I have two loads from Pilgrims P705 that I can bring into Mt. Sterling. Please advise if this is approved."

15

Doc. 71 at ¶ 56.  The employee responded, "We do not need any additional at this time.  We are planning to try to use more fresh on these productions and supplement with frozen."  *Id.*

Houlihan fails to show that such conduct is "inconsistent" with a later claim of breach-of-contract.  The Court assumes that Houlihan means to argue that the CTI employee's email was inconsistent with a claim that a contract existed because any contract would have compelled CTI to accept these loads of trim.  That argument fails for two reasons.  First, CTI did not recognize Pilgrim's as an approved supplier, as Houlihan has conceded, Doc. 73 at ¶¶ 7–9, and CTI's breach-of-contract claim appears to involve an alleged contract under which only trim from CTI-approved suppliers qualified.  Doc. 75 at ¶ 71.  Second, CTI claims it was performing its contractual duty to purchase approximately one load of trim per week in the months of January and February.  Doc. 71 at ¶ 54.  Under that theory, Houlihan offered two *extra* loads here, which CTI had no obligation to accept at the time.  Rejecting loads from Pilgrim's, then, did not amount to acting inconsistently with a later breach-of-contract claim.

Regarding CTI's supposed "attempt[] to circumvent Houlihan," the key word in CTI's breach-of-contract counterclaim is "breach."  Houlihan has not addressed the possibility that CTI's actions here may have constituted a valid attempt to cover after Houlihan's alleged breach or repudiation.  *See* Mo. Rev. Stat. § 400.2-711(1)(a) ("Where the seller fails to make delivery or repudiates . . . then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract . . . the buyer may cancel and whether or not he has done so may . . . 'cover' and have damages under section 400.2-712 as to all the goods affected whether or not they have been identified to the contract.").  Nor has Houlihan shown how covering in this situation would be "inconsistent" with a later breach-of-contract claim. *Charter Commc'ns*, 569 S.W.3d at 510 (quoting *Lake St. Louis*, 746 S.W.2d at 646). Because Houlihan has not come

16

forward with facts showing a genuine issue for trial—indeed, it has not even seriously attempted to oppose CTI's motion as to this defense—the Court grants CTI's motion as to Houlihan's equitable estoppel defense.  *See Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 915 (8th Cir. 2007) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."  (quoting *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990) (per curiam))).

Houlihan's waiver defense meets the same fate.  Waiver involves "the intentional relinquishment of a known right and if implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right."  *Shapiro v. Shapiro*, 701 S.W.2d 205, 206 (Mo. Ct. App. 1985) (citing *Ehrle v. Bank Building Corp. of Am.*, 530 S.W.2d 482 (Mo. Ct. App. 1975)).  The record shows that CTI repeatedly insisted upon its rights in the alleged contract.  For example, when Griffin alerted CTI that all approved suppliers were "showing zero inventory" on frozen trim, Lansdell emailed Griffin, "Are you not going to honor the contract with fresh?"  Doc. 71 at ¶ 71 (quoting Exh. X); Doc. 65-1 at pp. 43–44.  CTI also sent Houlihan a formal demand letter regarding "Breach of Contract for Sale of Frozen Chicken Trim," in which CTI put Houlihan on notice of "potential litigation."  Doc. 71-1. In response to CTI's motion, Houlihan does not specify what right CTI supposedly waived or what conduct would support such a finding.  Again, the Court need not search the record for support of Houlihan's defense.  *Gilbert*, 495 F.3d at 915 (quoting *White*, 904 F.2d at 458).  Because Houlihan has not come forward with facts showing a genuine issue for trial, or even seriously attempted to oppose CTI's motion as to this defense, the Court grants CTI's motion as to Houlihan's waiver defense.

The Court further grants CTI's motion as to Houlihan's equitable defenses of laches and unclean hands.  These defenses only apply to CTI's equitable promissory-estoppel counterclaim, on which CTI has not moved for summary judgment, and don't apply to its legal breach-of-contract counterclaim, on which it has.  *See Templeton v. Cambiano*, 558 S.W.3d 101, 104–05 & n.1 (Mo. Ct. App. 2018) (laches inapplicable to breach-of-contract claim); *Sangamon Assocs., Ltd. v. Carpenter 1985 Fam. P'ship, Ltd.*, 165 S.W.3d 141, 145 (Mo. 2005) ("The doctrine of unclean hands is a defense that bars one . . . from obtaining an equitable remedy." (citing *Karpierz v. Easley*, 68 S.W.3d 565, 572 (Mo. Ct. App. 2002))).

Regarding laches, the Court notes that Houlihan does not attempt to oppose CTI's motion as to Houlihan's laches defense—indeed, Houlihan fails to mention it in its briefing.  *See* Doc. 70.  This failure alone provides a sufficient basis for the Court to grant CTI's motion as to the laches defense.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument."). The Court, then, grants CTI's motion on this point.

The Court also grants its motion as to Houlihan's unclean-hands defense.  "The doctrine of unclean hands is a defense that bars one who has acted wrongfully with respect to the subject of the suit from obtaining an equitable remedy."  *Sangamon*, 165 S.W.3d at 145 (citing *Karpierz*, 68 S.W.3d at 572).  "This doctrine should be applied when it promotes right and justice by considering all of the facts and circumstances of a particular case."  *Id.* (citing *Durwood v. Dubinsky*, 361 S.W.2d 779, 791 (Mo. 1962)).  In opposing CTI's motion, Houlihan, in vague and cursory fashion, points to Lansdell's decision to seek trim directly from suppliers after Houlihan became unable to fill orders.  Houlihan, however, has not attempted to argue why Lansdell's actions amount to "act[ing] wrongfully," *id.* (citing *Karpierz*, 68 S.W.3d at

18

572), or why applying the defense would "promote[] right and justice." *Id.* (citing *Durwood*, 361 S.W.2d at 791). Because Houlihan has not shown a genuine issue for trial, *Matsushita*, 475 U.S. at 587, the Court grants CTI's motion on this point as well.

CTI also seeks judgment on Houlihan's affirmative defense of lack of consideration. Doc. 62. Because the Court's denial of summary judgment on CTI's breach-of-contract counterclaim turned on the presence of genuine issues of material fact as to CTI's assent to a quantity term, genuine issues of material fact necessarily exist as to Houlihan's lack-of-consideration affirmative defense. The Court denies CTI's motion as to this defense.

CTI finally argues that the parties' writings satisfy the statute of frauds and that the Court should therefore grant its motion as to Houlihan's statute-of-frauds affirmative defense. Under the Missouri Uniform Commercial Code,

> a *contract* for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some *writing* sufficient to indicate that *a contract for sale has been made* between the parties and *signed by the party against whom enforcement is sought* or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

Mo. Rev. Stat. § 400.2-201(1) (emphasis added). Not just any writing will do; the writing must "indicate the consummation of a contract, not mere negotiations." *Howard Const. Co. v. Jeff-Cole Quarries, Inc.*, 669 S.W.2d 221, 227 (Mo. Ct. App. 1983) (citing *Rockland Industries, Inc. v. Frank Kasmir Assocs.*, 470 F. Supp. 1176, 1178–79 (N.D. Tex. 1979)).

The statute-of-frauds analysis depends on the resolution of questions that the Court does not answer here. Given the presence of fact issues on whether a yearlong contract existed, the Court does not decide whether the statute of frauds renders enforceable any hypothetical contract. *See Flast v. Cohen*, 392 U.S. 83, 88 (1968) ("The oldest and most consistent thread in

19

the federal law of justiciability is that federal courts will not give advisory opinions."); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (For a federal court to render judgment, the issue before it must be "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–241 (1937))).

### 3.     The Court does not reach Houlihan's commercial-impracticability defense.

CTI seeks judgment on Houlihan's commercial-impracticability defense.  Under the UCC, "[d]elay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . ."  Mo. Rev. Stat. § 400.2-615.  To prove commercial impracticability, the party raising the defense must show:  "(1) the occurrence of a contingency; (2) the nonoccurrence of which was a [b]asic assumption upon which the contract was made; and (3) by which occurrence further performance has become commercially impracticable."  *Mo. Pub. Serv. Co. v. Peabody Coal Co.*, 583 S.W.2d 721, 726 (Mo. Ct. App. 1979) (citing *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir. 1966)).

However, "[t]he central issue in the application of the doctrine of impractability [sic] is foreseeability.  If the risk of the occurrence of the contingency was foreseeable, the risk is tacitly assigned to the seller."  *Structural Polymer Grp., Ltd. v. Zoltek Corp.*, No. 4:05-cv-00321, 2006 WL 8445566, at *5 (E.D. Mo. Sept. 14, 2006) (citing *Waldinger Corp. v. CRS Group Engineers, Inc., Clark Dietz Div.*, 775 F.2d 781, 786 (7th Cir. 1985)).  "The defense of impracticability is unavailable where a contingency is foreseeable because the disadvantaged party could have

contractually protected itself." *Id.* (citing *Waldinger Corp.*, 775 F.2d at 786). The Court does not enter judgment on this defense because its resolution depends, in part, on whether a yearlong installment contract existed in the first place. *See Flast*, 392 U.S. at 88.

The Court, however, observes that Houlihan faces an uphill battle in arguing that pandemic-related trim-market disruptions were unforeseeable. In support of its motion, CTI points to the deposition of Houlihan's own third-party witness, Richard Trenary, the Vice President for Industrial Sales at Perdue Foods (a CTI-approved supplier). Houlihan acknowledges Trenary's testimony that the trim market is "inherently unpredictable even under favorable market conditions." Doc. 71 at ¶ 96 (citing Exh. AM); Doc. 65-11 at pp. 28–29. Houlihan further acknowledges that "trim is always somewhat volatile in terms of production." Doc. 70 at p. 15. CTI also points out that Houlihan was aware of the Covid-19 pandemic as early as March of 2020—months before the parties allegedly entered a contract—when Houlihan's employees worked remotely after St. Louis County issued stay-at-home orders. Doc. 71 at ¶ 93. In October 2020, also before allegedly entering into a contract for 2021, a CTI employee sent Houlihan's Griffin an email mentioning "the COVID-19 Pandemic and the disruption of the global supply chain." *Id.* at ¶ 94 (quoting Exh. AB); Doc. 65-1 at p. 56.

### B.    Houlihan's Motion for Summary Judgment

Houlihan seeks judgment on its request for a declaration: (1) that no yearlong contract obligating Houlihan to provide CTI with any definite quantity of product existed; and (2) that, even if the parties entered such an agreement, the doctrine of commercial impracticability excused Houlihan's performance. Docs. 58, 6. It also seeks judgment on its affirmative defenses of statute of frauds and lack of consideration, on CTI's promissory-estoppel claim, and on the "damages" element of CTI's counterclaim. Doc. 58.

### 1. Houlihan has failed to disprove the existence of a yearlong contract.

The Court found above that CTI has not met its burden of showing a yearlong contract existed, but that does not necessarily mean that Houlihan has met its burden of showing the opposite.  Houlihan argues that no yearlong contract existed because (1) Houlihan never made an offer and (2) the parties' conduct does not establish a yearlong contract.  Doc. 59 at pp. 3–6, 9–11.  These arguments fail.  As noted above, "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined," so the Court need not pinpoint offer and acceptance.  Mo. Rev. Stat. § 400.2-204.  Houlihan has not come forward with any facts negating the existence of a yearlong contract.  CTI, however, has come forward with the same facts and assertions that the Court addressed above on CTI's motion.  Doc. 73 at ¶¶ 32, 44.  Accordingly, genuine issues of material fact exist as to the existence—or nonexistence—of a yearlong installment contract, and the Court denies Houlihan's motion on this point.

### 2. The Court denies Houlihan's motion as to its affirmative defenses of lack of consideration, statute of frauds, and its defense of commercial impracticability.

The Court denies Houlihan's motion as to its lack-of-consideration defense.  Houlihan argues that CTI had no obligation to purchase any chicken trim from Houlihan.  Doc. 59 at pp. 6–9.  Because the Court has already found the presence of genuine issues of material fact as to CTI's assent to a quantity term, genuine issues of material fact also exist as to Houlihan's lack-of-consideration affirmative defense.

The Court further denies Houlihan's motion as to its statute-of-frauds defense.  As noted above, the statute-of-frauds analysis depends on the resolution of questions that the Court does

not answer here, so the Court does not decide whether the statute of frauds renders unenforceable any hypothetical contract.  *See Flast*, 392 U.S. at 88.

The Court further denies Houlihan's motion as to its commercial-impracticability defense.  Because, as noted above, Houlihan's commercial-impracticability defense depends in part on the resolution of genuine issues of fact, the Court denies Houlihan's motion on this point. *See id.*

### 3.    The Court does not reach the "damages" element of CTI's counterclaim.

Houlihan seeks judgment on the "damages" element of CTI's breach-of-contract counterclaim, arguing that CTI failed to cover with like-kind goods, assuming a yearlong contract existed.  Doc. 59 at pp. 13–14.  When a seller breaches a contract, "a buyer [has] the right [under Mo. Rev. Stat. § 400.2-712] to purchase reasonable substitutes and recover the difference between the cost to obtain the substitute goods and the contract price."  *Martella v. Woods*, 715 F.2d 410, 413 (8th Cir. 1983).  To recover under § 400.2-712, "the buyer must act in good faith and in a reasonable manner in purchasing substitute goods, and the goods must be a like-kind substitute."  *Id.*  But before reaching the "damages" element of CTI's counterclaim, the Court would first have to find the existence of a yearlong contract.  *See Flast*, 392 U.S. at 88. The Court denies Houlihan's motion as to the "damages" element of CTI's counterclaim.

### 4.    Houlihan has not met its burden in seeking judgment on CTI's promissory-estoppel claim.

Houlihan seeks judgment on CTI's alternative promissory-estoppel counterclaim.  "A claim of promissory estoppel has four elements: (1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure."  *Clevenger v. Oliver Ins.*

23

*Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (quoting *Zipper v. Health Midwest,* 978 S.W.2d 398, 411 (Mo. Ct. App. 1998)).  Houlihan argues, in conclusory fashion, that "CTI has failed to establish a definite promise by Houlihan to supply a definite quantity of frozen trim."  Doc. 59 at p. 14.  But Houlihan does not explain, for example, why none of Griffin's communications should qualify as promises.  *See, e.g.*, Doc. 33 at ¶ 37 ("Please see attached (revised) pricing for 2021 15DN to KY. Frozen Chicken B/S Breast Trim / Wax Cases / 15 DN @ .67 Delivered KY / Set Price 2021.").  Houlihan does not meaningfully attempt to address the other elements of the claim.  Doc. 59 at p. 14.  Houlihan shoulders the burden to show the absence of any genuine issue of material fact and its entitlement to judgment.  Because it has failed to make either showing, the Court denies its motion as to CTI's promissory-estoppel counterclaim.  *See* Fed. R. Civ. P. 56(a); *Liberty Lobby*, 477 U.S. at 250.

## IV.    Conclusion

Accordingly, the Court partially grants and partially denies CTI's [62] motion for partial summary judgment.  The Court grants the motion as to: (1) Houlihan's equitable estoppel defense; (2) Houlihan's waiver defense; (3) Houlihan's laches defense; and (4) Houlihan's unclean-hands defense.  The Court denies the remainder of CTI's motion.  The Court further denies Houlihan's [58] motion for summary judgment.

So Ordered this 9th day of January, 2023.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE

24